**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MONTE WHITEHEAD,

Plaintiff,

v. Civ. No. 17-275 MV/KK

MANAGEMENT AND TRAINING CORPORATION *et al.*,

Defendants.

**MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

THIS MATTER is before the Court on: (a) Plaintiff's Motion for Partial Summary Judgment against MTC Defendants (Doc. 124) ("Plaintiff's Motion"), filed November 21, 2019; and, (b) OCPF Defendants' Motion for Summary Judgment (Doc. 143) ("Defendants' Motion"), filed April 3, 2020. By an Order of Reference (Doc. 148), filed May 11, 2020, this matter was referred to the undersigned to conduct hearings if warranted, and to perform any legal analysis required to recommend an ultimate disposition of the case. The Court, having reviewed the parties' submissions, the record, and the relevant law, and being otherwise fully advised, proposes to find that Plaintiff's Motion is not well taken and recommends that it be DENIED. The Court further proposes to find that Defendants' Motion is well taken in part and recommends that it be GRANTED IN PART and DENIED IN PART as set forth herein.

## I. Introduction

This case arises out of Plaintiff's incarceration at the Otero County Prison Facility ("OCPF") from March 2013 to April 2017. (Doc. 119 at 3; Doc. 142-1 at 2.) While many of Plaintiff's claims have been dismissed or stricken, the following claims remain: (1) Plaintiff's First Amendment claims against Defendants Management and Training Corporation ("MTC"),

James Frawner, Richard Martinez, and FNU Azuna challenging these Defendants' restrictions on Plaintiff's possession and receipt of hardbound books, (Doc. 119 at 29-33); (2) Plaintiff's First Amendment claims against Defendants MTC, Frawner, Martinez, Azuna, FNU Moreno, and FNU Barba (collectively, "Defendants") challenging Defendants' requirement that Plaintiff purchase publications from approved vendors, (*id.* at 36-38); (3) Plaintiff's First Amendment claims challenging Defendants' restrictions on Plaintiff's receipt of internet printouts and newspaper articles, (*id.* at 14-19); and, (4) Plaintiff's First Amendment retaliatory transfer claim against Defendant Martinez. (*Id.* at 43-50; *see also* Doc. 135.) In the cross-motions presently before the Court, Plaintiff seeks summary judgment on the first three claims and Defendants seek summary judgment on all of them.[1] (Docs. 124, 143.)

## II. Procedural History

Plaintiff, a *pro se* prisoner, commenced this action by filing a Complaint for Damages for Violations of Civil and Constitutional Rights and for Declaratory and Injunctive Relief in state court on November 14, 2016. (Doc. 1-1.) At the time, Plaintiff was housed at the OCPF.[2] (*Id.* at 3.) On March 1, 2017, a former defendant removed the case to this Court. (Doc. 1.) In a Memorandum Opinion and Order dated September 27, 2017, United States District Judge Robert Junell dismissed Plaintiff's federal claims under Federal Rule of Civil Procedure 12(b)(6), denied Plaintiff's motions to amend his complaint and supplement the pleadings, declined to exercise supplemental jurisdiction over his state law claims, and remanded the state law claims to state

[1] Plaintiff also sought summary judgment on his claims based on the First Amendment's religion clauses and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc *et seq*. (Doc. 124; *see* Doc. 119 at 64-75.) However, these claims have been stricken because Plaintiff included them in his amended complaint without the Court's leave or the opposing parties' written consent. (Doc. 135 at 5-7.) The portion of Plaintiff's Motion seeking summary judgment on these claims should therefore be denied as moot.

[2] Plaintiff was transferred to the Guadalupe County Correctional Facility ("GCCF") on April 17, 2017, (Doc. 22 at 1; Doc. 119 at 44-45), and to the Penitentiary of New Mexico on January 7, 2020. (Doc. 131 at 1.)

court. (Doc. 91.) On February 12, 2018, Plaintiff appealed the Court's decision as to his federal claims but did not challenge the remand of his state law claims. (Doc. 99; Doc. 110-1 at 2.)

In an Order and Judgment entered on April 2, 2019, the Tenth Circuit affirmed this Court's decision in part and reversed it in part, remanding the case "for further proceedings consistent with [its] order and judgment." (Doc. 110-1 at 23.) In many respects, the Tenth Circuit affirmed this Court's dismissal of Plaintiff's federal claims. (*See generally id.*) However, the Tenth Circuit vacated the dismissal of Plaintiff's claims that "certain defendants violated his First Amendment rights by preventing him from receiving hardback books, books from non-approved vendors, information from the internet, and newspaper articles sent by mail," and remanded these claims "to the district court for consideration in the first instance." (*Id.* at 5, 8.) The appellate court noted that this Court's consideration on remand could "include allowing the prison-official defendants to proffer a legitimate penological reason for the restrictions." (*Id.* at 8.)

The Tenth Circuit also held that this Court improperly denied Plaintiff's Motion for Leave to Amend the Complaint (Doc. 23) and Motion to Supplement the Pleadings (Doc. 60). (Doc. 110-1 at 22-23.) Specifically, the Tenth Circuit found that Plaintiff's retaliatory transfer claim "may be a proper claim for relief," noting that "prison officials may violate a prisoner's First Amendment rights when they transfer the prisoner because the prisoner exercised those rights."[3] (*Id.* at 22 & n.15.) Accordingly, the Tenth Circuit reversed and remanded the "denial of [Plaintiff's] motion to amend the complaint and his motion to supplement the pleadings to the district court for evaluation consistent with this order and judgment." (*Id.* at 22-23.)

[3] However, the Tenth Circuit found "that the district court did not err in denying [Plaintiff] leave to expand on his equal-protection claim or to add unspecified exhibits." (*Id.* at 22 n.16.)

On remand, the Court granted Plaintiff's motions to amend and supplement, permitting Plaintiff to "file an amended complaint reasserting his First Amendment claims and asserting a First Amendment retaliatory transfer claim." (Doc. 112 at 6.) Plaintiff timely filed an Amended and Supplemental Complaint for Damages of Civil and Constitutional Rights and for Declaratory and Injunctive Relief on October 10, 2019. (Doc. 119.) Plaintiff's amended complaint exceeded the scope of the amendments the Court gave him leave to file in several respects. (Doc. 135 at 3-4.) As such, on March 6, 2020, the Court entered an order striking the unauthorized portions of the amended complaint. (*Id.* at 6-7.)

On November 21, 2019, Plaintiff moved for partial summary judgment. (Doc. 124.) Defendants responded in opposition to Plaintiff's Motion on December 3, 2019, and Plaintiff filed a reply in support of it on December 19, 2019. (Docs. 127, 128.)

On March 4, 2020, the Court ordered Defendants to file a *Martinez* Report addressing, with limited exceptions, "all of Plaintiff's allegations against the OCPF Defendants, as well as any defenses raised in the OCPF Defendants' answers that they wish to pursue." (Doc. 134 at 4.) In its Order, the Court notified the parties that

> the Court may use the *Martinez* Report in deciding whether to grant summary judgment for or against any party, whether by motion or *sua sponte*. As such, the parties (including Plaintiff in his response or objections to the *Martinez* Report) are urged to submit whatever proof or other materials they consider relevant to Plaintiff's claims against the OCPF Defendants and the OCPF Defendants' defenses in the pleadings they file pursuant to this Order.

(*Id.* at 6-7.)

Defendants filed their *Martinez* Report on April 2, 2020. (Doc. 142.) Plaintiff filed a response in opposition to the report on May 26, 2020, and Defendants filed a reply in support of it on June 15, 2020. (Docs. 149, 151.) At the Court's direction, Defendants also filed a Supplemental

*Martinez* Report on August 14, 2020, to which Plaintiff responded on September 2, 2020. (Docs. 156, 159.)

Defendants moved for summary judgment in conjunction with their original *Martinez* Report on April 2, 2020. (Doc. 143.) Plaintiff responded in opposition to Defendants' Motion on June 1, 2020, and Defendants replied in support of it on June 15, 2020. (Docs. 150, 152.) The parties' cross-motions for summary judgment are thus fully briefed and ready for resolution.

## III. Analysis

### A. Legal Standards Governing Summary Judgment

Under Federal Rule of Civil Procedure 56, this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that "there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant meets this burden, Rule 56(c) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *See Celotex Corp*., 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986); *Vitkus v. Beatrice Co*., 11 F.3d 1535, 1539 (10th Cir. 1993).

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citation omitted). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). For purposes of summary judgment, a prisoner's complaint is treated as evidence if it alleges specific facts based on the prisoner's personal knowledge and has been subscribed under penalty of perjury. 28 U.S.C. § 1746; *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). "A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Id.* However, "it is not the proper function of the district court to assume the role of advocate for the *pro se* litigant." *Id.* at 1110.

When reviewing a motion for summary judgment, the Court must keep in mind three principles. First, the Court's role is not to weigh the evidence, but to assess the threshold issue of whether a genuine issue of material fact exists, requiring a trial. *Anderson*, 477 U.S. at 249. Second, the Court must draw all reasonable inferences in favor of, and construe all evidence in the light most favorable to, the non-moving party. *Hunt v. Cromartie*, 526 U.S. 541, 552-53 (1999). Finally, the Court cannot decide issues of credibility. *Anderson*, 477 U.S. at 255. "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor." *Id*. at 257.

## B. Plaintiff's First Amendment Claims Regarding Access to Information

### 1. *Legal Standards*

Prisoners have a First Amendment right "to receive information." *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004). However, prison officials may curtail this right to further legitimate penological interests. *Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989). Indeed, "prisoners' rights may be restricted in ways that would raise grave First Amendment concerns outside the prison context." *Gee v. Pacheco*, 627 F.3d 1178, 1187 (10th Cir. 2010) (quoting *Thornburgh*, 490 U.S. at 407) (quotation marks omitted). "Running a prison is an inordinately

difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). Consequently, in considering the constitutional validity of prison regulations, courts should "accord deference to the appropriate prison authorities." *Id.* at 85.

To effectuate the principle that "prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations," the Supreme Court has held that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89 (alterations omitted). The *Turner* Court delineated four factors courts must consider in determining whether a prison regulation satisfies this requirement.[4] *Id.* at 89-91.

First, "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89 (quotation marks omitted); *Jones v. Salt Lake Cty.*, 503 F.3d 1147, 1153 (10th Cir. 2007). This factor "is the most important; . . . it is not simply a consideration to be weighed but rather an essential requirement." *Al-Owhali v. Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012) (quotation marks omitted); *see also Parkhurst v. Lampert*, 339 F. App'x 855, 860 (10th Cir. 2009) ("The first consideration is mandatory."). This factor is also "multifold," requiring both that the regulation be rationally related to a governmental objective, and that the governmental objective be "legitimate and neutral." *Thornburgh*, 490 U.S. at 414. The rational relationship test is met "where the logical connection between the regulation and the asserted goal" is not "so remote as to render the policy arbitrary or irrational." *Turner*,

---

[4] The Tenth Circuit applies the four-factor *Turner* analysis to both written and unwritten restrictions, and in the context of both jails and prisons. *Jones v. Salt Lake Cty.*, 503 F.3d 1147, 1155 n.7, 1158 n.13 (10th Cir. 2007).

482 U.S. at 89-90. The neutrality requirement, in turn, is met "[w]here a regulation furthers an important or substantial government interest unrelated to the suppression of expression." *Jones*, 503 F.3d at 1153.

The second *Turner* factor "is whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Jones*, 503 F.3d at 1153 (quoting *Turner*, 482 U.S. at 90). The alternative means "need not be ideal; they need only be available." *Id.* (alterations omitted). "[E]ven if not the best method from the inmate's point of view, if another means of exercising the right exists, the second *Turner* factor does not undercut the challenged restriction." *Wardell v. Duncan*, 470 F.3d 954, 961–62 (10th Cir. 2006) (quotation marks omitted). Moreover, "'the right' in question must be viewed sensibly and expansively." *Thornburgh*, 490 U.S. at 417. Also, though "[t]he absence of any alternative . . . provides some evidence that the regulations are unreasonable," it "is not conclusive." *Beard v. Banks*, 548 U.S. 521, 532 (2006) (quotation marks and alterations omitted).

The third *Turner* factor requires courts to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90; *Jones*, 503 F.3d at 1153. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90; *see also Jones*, 503 F.3d at 1153-54 ("[W]here the right in question can only be exercised at the cost of significantly less liberty and safety for everyone else, guards and other

prisoners alike, the courts should defer to the informed discretion of corrections officials[.]") (quoting *Thornburgh*, 490 U.S. at 418) (quotation marks omitted).

Finally, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation," whereas "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Turner*, 482 U.S. at 90 (quotation marks omitted); *Jones*, 503 F.3d at 1154. The Supreme Court has emphasized that

> [t]his is not a least restrictive alternative test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner*, 482 U.S. at 90–91 (citation and quotation marks omitted); *Jones*, 503 F.3d at 1154.

The *Turner* analysis "requires courts, on a case-by-case basis, to look closely at the facts of a particular case and the specific regulations and interests of the prison system in determining whether prisoner's constitutional rights may be curtailed." *Wardell*, 470 F.3d at 961; *see also Boles v. Neet*, 486 F.3d 1177, 1181 (10th Cir. 2007) (*Turner* analysis "requires close examination of the facts of each case"); *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) (*Turner* analysis must be considered "on a case-by-case basis"). While prison officials must "show more than a formalistic logical connection between a regulation and a penological objective," *Beard*, 548 U.S. at 535, ultimately "[t]he burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *Jones*, 503 F.3d at 1159. The Court will consider the parties' cross-motions for summary judgment

on Plaintiff's First Amendment claims challenging Defendants' restrictions on his access to information in light of the foregoing standards.[5]

2. *Analysis*[6]

a. Hardbound Books

The Court will first consider Plaintiff's claims that Defendants violated his First Amendment rights by restricting his possession and receipt of hardbound books during his incarceration at the OCPF. (Doc. 119 at 29-33.) When Plaintiff arrived at the OCPF in March 2013, he was ordered to remove the hard covers from six hardbound books he brought with him from Northeastern New Mexico Correctional Facility ("NENMCF") or send the books home. (Doc. 119 at 31; Doc. 123 at 15.) Plaintiff "ruined" four books trying to tear off the covers and sent the remaining two home. (Doc. 119 at 31.)

There is no record evidence that Plaintiff filed an informal complaint, formal grievance, or grievance appeal about these six books.[7] (*See generally* Docs. 1-1, 119, 142-11.) However, in November and December 2014, Plaintiff did file an informal complaint, formal grievance, and grievance appeal contending that the New Mexico Corrections Department ("NMCD") policy banning inmates' receipt of hardbound books through the mail was "not right" and unconstitutional. (Doc. 119 at 135, 137, 139.) In response, OCPF personnel informed Plaintiff

[5] In their Motion, Defendants do not argue that any individual Defendant is entitled to summary judgment because he or she had no personal involvement in restricting Plaintiff's access to information in the manner alleged. (*See generally* Doc. 143.) Thus, the Court will consider Plaintiff's First Amendment access-to-information claims against Defendants collectively.

[6] The facts recited in this section are undisputed except as otherwise noted. Further, the Court resolves all genuine, material factual disputes, construes all cognizable evidence, and draws all reasonable inferences in Plaintiff's favor.

[7] Plaintiff did file an informal complaint and formal grievance alleging that one of these books went missing during his transfer to OCPF; upon investigation, the book was found in his mother's possession. (Doc. 142-11 at 53, 55.) In their Motion, Defendants do not argue that Plaintiff failed to exhaust his administrative remedies with respect to his First Amendment access-to-information claims based on the six hardbound books he brought with him from the NENMCF. (*See generally* Doc. 143.)

that hard book covers were a prohibited item, and hardbound books were not allowed in accordance with NMCD Policy 151201. (*Id.* at 136, 138.)

On December 8, 2015, Plaintiff received two hardbound books from either Barnes & Noble or Amazon and was again told to remove the hard covers if he wanted to keep them. (Doc. 1-1 at 179; Doc. 119 at 31; Doc. 150 at 2, 8.) He elected to send the books home. (Doc. 119 at 31.) Plaintiff filed a "Form I-60" and an informal complaint regarding these books in December 2015. (*Id.* at 153-54.) In response, OCPF personnel again cited to NMCD Policy 151201 to explain why Plaintiff was told to remove the books' hard covers. (*Id.* at 155.) The record does not reflect that Plaintiff filed a formal grievance or grievance appeal about these books.[8]

Under NMCD Policy 151201(E)(6)(e) in effect at the relevant times, hardbound books were cause for rejection of incoming mail. (Doc. 142-1 at 4; Doc. 142-3 at 6-7.) From March 2013 to October 2016, the OCPF Inmate Handbook provided that "hard-back books can be received only if the covers are removed," (Doc. 142-10 at 11, 31, 51, 69); and, from October 2016 to April 2017, it provided that "[n]o hardbound books are permitted."[9] (*Id.* at 84.) A memorandum from "D. Simmons thru Warden Frawner" stated that, "[e]ffective October 3, 2013 inmates will no longer be able to accept 'HARD COVER BOOKS' from outside vendors or family members. Any Hard Cover Books delivered will need to be sent home at inmates [sic] expense." (Doc. 119 at 140.) In short, "inmates [were] not permitted to possess hardback books or receive hardback

[8] Again, in their Motion, Defendants do not contend that Plaintiff failed to exhaust his administrative remedies with respect to his First Amendment access-to-information claims based on the two hardbound books he ordered from Barnes & Noble or Amazon. (*See generally* Doc. 143.)

[9] The OCPF Inmate Handbook in effect from October 2016 to April 2017 also provided that "[i]nter-library loans are . . . available only in paperback books." (Doc. 142-10 at 87.) It is unclear whether inmates were permitted to receive hardbound books through the interlibrary loan process before October 2016. Plaintiff declared that, when the books he requested through inter-library loan were hardbound, Defendant Azuna rejected them; however, in an affidavit attached to Plaintiff's response to Defendants' Supplemental *Martinez* Report, inmate James Martin attested that, on unspecified dates, the OCPF allowed him to receive two hardbound books via interlibrary loan. (Doc. 119 at 32; Doc. 159 at 29.)

books in mail" during Plaintiff's incarceration at the OCPF, unless the hard covers were removed. (Doc. 142-1 at 6.)

There was, however, an exception to the OCPF's hardbound book ban. Specifically,

> [d]uring the period of Plaintiff's incarceration at OCPF, books provided for certain college courses, including an automotive class, were only available in hardback. Therefore, OCPF allowed limited access to hardback books for these classes. Still, none of these books were delivered to State inmate[s] through the mail. OCPF provided them to those inmates enrolled in these classes.

(*Id.*) As an inmate college facilitator/tutor at the OCPF, Plaintiff handed out hardbound college textbooks to inmates, including himself, taking courses at Mesalands Community College. (Doc. 119 at 32.) Also, the OCPF ordered hardbound books for an automotive class from Amazon. (*Id.* at 33; Doc. 159 at 29.) Inmates kept these hardbound college textbooks with their property and had broad access to them. (Doc. 150 at 5.)

For the reasons explained below, the Court proposes to find that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law with respect to Plaintiff's First Amendment claims challenging the foregoing restrictions on his access to hardbound books during his incarceration at the OCPF. Addressing the first *Turner* factor, *i.e.*, whether the restrictions are rationally related to a legitimate, neutral penological purpose, *Turner*, 482 U.S. at 89, Defendants proffered that

> [h]ardback books received through the mail present a security risk for the smuggling of contraband such as drugs and weapons, and otherwise require a more involved security review for content given the length of information at issue. Hardback books are difficult to search effectively, yet they are particularly good for smuggling contraband such as, money, drugs, and weapons that can easily be secreted in the bindings. The contents of mailed books must also be reviewed for sexually explicit content and material that may support/induce violence, as well as information that could assist an inmate with escape, provide information about banned substance manufacturing and trafficking, and/or provide information about other activities which may threaten security and safety at OCPF.

(Doc. 142-1 at 3-4.)

"[P]rotecting prison security [is] a purpose . . . central to all other corrections goals." *Thornburgh*, 490 U.S. at 415 (quotation marks omitted). Thus, there is no question that the proffered purpose of Defendants' prohibition of hardbound books received through the mail—*i.e.*, to prevent the introduction of contraband and disruptive content into the OCPF—is legitimate and neutral.

Whether there is a rational relationship between this purpose and the restriction at issue is a more nuanced question. In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court held that "a prohibition against receipt of hardback books unless mailed directly from publishers, book clubs, or bookstores" was "a rational response by prison officials to an obvious security problem." *Id.* at 550. In so holding, the *Bell* Court observed that "hardback books are especially serviceable for smuggling contraband into an institution[. M]oney, drugs, and weapons easily may be secreted in the bindings," yet they are "difficult to search effectively." *Id.* at 551. However, the *Bell* Court also appeared to accept the defendant warden's testimony that "there is relatively little risk that material received directly from a publisher or book club would contain contraband, and therefore, the security problems are significantly reduced without a drastic drain on staff resources." *Id.* at 549.

In *Jones*, in turn, the institution at issue "prohibit[ed] inmates from possessing hardback books," and "allow[ed] inmates to obtain paperback books from the jail library and, with permission, the publisher," as well as, for a time, from a local Barnes & Noble store via public donation. 503 F.3d at 1156-58. The plaintiff in that case did not contest the institution's hardbound book ban but did "challenge the paperback book policy." *Id.* at 1156. The Tenth Circuit found that the facility's paperback book policy was rationally related to the legitimate, neutral penological purpose of promoting prison security. *Id.* at 1158. In so holding, the court observed

that "[a]llowing inmates to purchase paperback books only from the publisher prevents contraband from being smuggled into the jail and lessens the administrative burden on jail personnel who must inspect each book." *Id.*

In an unpublished opinion, the Tenth Circuit recently stated that "[t]he implication of [*Bell*] and *Jones* is that a complete ban on hardcover books . . . would likely violate the First Amendment." *Khan v. Barela*, 808 F. App'x 602, 608 (10th Cir. 2020). The *Khan* court explained that, according to *Bell* and *Jones*, "one of the usual justifications . . . for a ban on hardcover books . . . —limiting contraband—is not reasonably related to a restriction on hardcover books . . . sent by publishers." *Id.* (citation and quotation marks omitted). Implicitly recognizing the case-by-case, fact-intensive nature of the *Turner* analysis, however, the *Khan* court observed that the "defendants may be able to support this or other justifications for prohibiting [the plaintiff] from receiving" hardbound books. *Id.* The *Khan* defendants had not yet had the opportunity to justify their hardbound book restrictions, because the decision on appeal was the district court's *sua sponte* dismissal of the plaintiff's claims on a preliminary review of the pleadings. *Id.* at 604.

In this case, Defendants have presented Defendant Martinez's undisputed testimony that restrictions on hardbound books received directly from publishers, vendors, and book clubs is necessary to further the penological purpose of limiting contraband and disruptive content because an alleged publisher, vendor, or book club could be "a phony being used as a front to send contraband and/or illicit content."[10] (Doc. 142-1 at 7-8.) Since 1979, when the Supreme Court

[10] By "illicit content," Defendant Martinez referred to "sexually explicit content and material that may support/induce violence, as well as information that could assist an inmate with escape, provide information about banned substance manufacturing and trafficking, and/or provide information about other activities which may threaten security and safety at OCPF." (Doc. 142-1 at 4.) Regulations designed to prevent the introduction of such material into a prison are considered "neutral" under *Turner* because they "further[] an important or substantial government interest unrelated to the suppression of expression." *Jones*, 503 F.3d at 1153; *Thornburgh*, 490 U.S. at 415. "In other words, where prison officials draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are neutral." *Jones*, 503 F.3d at 1153 (quotation marks omitted). At any rate, none of the policies at issue here restricted publications based on their content; on the contrary, all of the challenged restrictions

issued its decision in *Bell*, the advent of the internet and other technological advances have made it vastly easier and cheaper for an average individual to publish or sell a book or successfully pose as a book publisher, vendor, or club. In this millennium, "publishers only" rules may indeed provide considerably less protection from contraband smuggling than they used to. Thus, and in light of *Bell*, *Jones*, and *Khan*, Defendant Martinez's undisputed testimony persuades the Court that Defendants' restrictions on hardbound books—including books received directly from publishers, vendors, and book clubs—are rationally related to their legitimate, neutral penological purpose of limiting contraband and disruptive content.

Although Plaintiff asserts that Defendants "have not pointed to a single incidence" where contraband was smuggled into the OCPF through a counterfeit publisher, vendor, or book club, (Doc. 150 at 7), they are not required to do so to show a rational relationship between their restrictions and the penological purpose they have proffered.

> To show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove that the banned materials actually caused problems in the past, or that the materials are likely to cause problems in the future. In other words, empirical evidence is not necessarily required. Moreover, it does not matter whether we agree with the defendants or whether the policy in fact advances the jail's legitimate interests. The only question that we must answer is whether the defendants' judgment was rational, that is, whether the defendants might reasonably have thought that the policy would advance its interests.

*Sperry v. Werholtz*, 413 F. App'x 31, 40 (10th Cir. 2011) (citations and quotation marks omitted). Here, Defendants reasonably believed that prohibiting inmates' receipt of hardbound books—even those purportedly sent from a publisher, vendor, or book club—would significantly reduce the introduction of contraband and disruptive content into the OCPF.

---

were factually as well as technically content neutral. Thus, the *Thornburgh* Court's suggestion that prison officials should make "individualized" determinations about whether to restrict particular *content* simply does not apply here, where Defendants restricted particular *formats* and *sources*. *See Thornburgh*, 490 U.S. at 416.

Plaintiff also argues that the OCPF's hardbound book restrictions are not rationally related to the proffered purpose of smuggling prevention because inmates were more likely to smuggle prohibited material into the prison in other ways. (Doc. 149 at 12, 18; Doc. 150 at 4, 6-7, 24; Doc. 159 at 4.) However, even assuming that these assertions are true and Plaintiff has personal knowledge of them,[11] there is no First Amendment rule that prison regulations must only address the most pressing security risks facing an institution. Such a rule would contravene the Supreme Court's instruction that "prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations." *Turner*, 482 U.S. at 89 (alterations omitted). Rather, the test is simply whether "defendants might reasonably have thought that the policy would advance [the prison's] interests." *Sperry*, 413 F. App'x at 40.

Plaintiff next contends that Defendants' selective restriction of hardbound books "shows the security concern is irrational or fabricated." (Doc. 150 at 25-26; Doc. 159 at 6-8.) However, Defendants proffered a rational explanation for treating hardbound college textbooks differently from other hardbound books.

> [T]extbooks come directly from the college to OCPF. They are not mailed to inmates or provided directly to inmates.[12] These college textbooks . . . are not OCPF property and must be returned to the college at the completion of the semester or when an inmate is transferred . . . . Therefore, neither OCPF nor the inmate can[] alter the book. Since OCPF's security concern largely stems from concerns about the smuggling of contraband from the outside, . . . the controlled manner in which college textbooks are admitted into OCPF and distributed to the inmates satisfies OCPF's security concerns.

(Doc. 156 at 12-13.)

---

[11] Plaintiff has not, for obvious reasons, tried to demonstrate personal knowledge of the relative difficulty of various methods of smuggling prohibited items into the OCPF.

[12] Likewise, the automotive textbooks that the OCPF ordered from Amazon were not mailed or provided directly to inmates, but rather were received and distributed by the institution. (*See* Doc. 119 at 33; Doc. 159 at 29.)

Interestingly, Plaintiff suggests that he could have smuggled contraband into the OCPF using textbooks from Mesalands Community College because he knows people who work or are students there. (Doc. 159 at 6-7.) But Plaintiff does not explain how he or any other inmate could have ensured that the OCPF would distribute a particular textbook containing contraband *to him*. In this regard, Plaintiff's argument actually highlights why "the controlled manner in which college textbooks are admitted into OCPF and distributed to the inmates satisfies OCPF's security concerns" in a way that hardbound books inmates received directly through the mail would not. (Doc. 156 at 12-13.)

Defendants' restriction on hardbound books in an inmate's possession upon arrival at the OCPF is also rationally related to the legitimate, neutral penological purpose of smuggling prevention. In their Supplemental *Martinez* Report, Defendants proffered a rational explanation for treating these books in the same manner as books inmates received through the mail. "The intake process at OCPF is the same for all inmates[,] whether transferred from another facility or not. Upon arrival at OCPF, inmates and their belongings must be thoroughly searched." (Doc. 156 at 10-11.) Defendants "[could not] rely on prior searches" to keep inmates, staff, and the public safe, because contraband sometimes came from other institutions as well as the outside world. (*Id.* at 11.) Indeed, Plaintiff admits as much. (*See* Doc. 159 at 3, 13.) One pertinent example is that "some inmates," including Plaintiff, "would arrive to OCPF from other facilities with prohibited hardback books," which, per NMCD policy, they "should [not] have had . . . in their possession in the first place."[13] (Doc. 156 at 11.)

In sum,

[13] Plaintiff argues that other institutions were justified in permitting inmates to receive hardbound books in violation of NMCD Policy 151201 because that policy is unconstitutional. (Doc. 159 at 3.) However, for the reasons explained herein, the Court disagrees.

> [a]n inmate bringing a hardbound book into OCPF from either an intake or a transfer poses the same security risks as receiving hardbound books from the mail. Hardbound books, mailed or in inmate's possession, present a security risk for the smuggling of contraband such as drugs and weapons, and otherwise require a more involved security review for content given the length of information at issue.

(*Id.*) For the foregoing reasons, the logical connection between Defendants' hardbound book restrictions and their legitimate, neutral penological purpose is not "so remote as to render the policy arbitrary or irrational," *Turner*, 482 U.S. at 89-90, and the restrictions therefore satisfy the first *Turner* factor.

The parties vigorously dispute a number of factual questions related to the second *Turner* factor, *i.e.*, whether Plaintiff had alternative means of exercising the constitutional right at issue. *Turner*, 482 U.S. at 90. Thus, for example, Defendant Martinez attested that the OCPF library contained about 19,000 books, while Plaintiff presented his own and other inmates' declarations estimating that the library contained from 3,000 to 10,000 books.[14] (*Compare* Doc. 142-1 at 5 with Doc. 149 at 15, 40, 47, 49, 53, 54; Doc. 150 at 4-5.) Likewise, Defendant Martinez attested that, "[u]sing the interlibrary loan system, inmates can request a book if OCPF does not have it available and the book will arrive at OCPF from another library." (Doc. 142-1 at 6.) However, Plaintiff declared that it took him about ten requests to obtain one book through the interlibrary loan process, and other inmates attested to similar response rates. (Doc. 149 at 7, 16, 50, 54; Doc. 150 at 17.) Finally, Defendant Martinez attested that, during Plaintiff's incarceration at the OCPF, there were five approved vendors from whom Plaintiff could order paperback books, including Barnes & Noble, which offered more than a million titles. (Doc. 142-1 at 7.) Plaintiff, in contrast,

[14] Pursuant to Federal Rule of Civil Procedure 56(d), Plaintiff declared that he needs additional discovery in the form of OCPF "[l]ibrary book inventories from 2013-2017 . . . to show [the] actual number of books [the] library contained." (Doc. 150 at 32.) However, for the reasons discussed in this section and in Section III.B.2.b., *infra*, even if these inventories were to show that the OCPF library contained only 3,000 books—the lowest of the estimates offered and below Plaintiff's own estimates of 5,000 to 10,000 books, (Doc. 149 at 15, 40; Doc. 150 at 4-5)—this would not create a genuine issue of material fact preventing the entry of summary judgment in Defendants' favor on Plaintiff's First Amendment access-to-information claims. The Court therefore denies Plaintiff's request for this information.

declared that, "[f]or the majority of the time . . . there were only two book distributors," *i.e.*, Edward R. Hamilton Booksellers ("Hamilton Booksellers") and Christian Book Distributors ("Christian Book"), and that Barnes & Noble was added "shortly" before he was transferred from the OCPF to another facility. (Doc. 149 at 39; Doc. 150 at 17.)

All of these factual disputes, however, are rendered immaterial by a fact that the parties do *not* dispute, *i.e.*, that Plaintiff could have kept his hardbound books—both those with which he arrived and those he later received in the mail—had he removed the books' hard covers. (*See, e.g.*, Doc. 1-1 at 179; Doc. 119 at 31; Doc. 142-1 at 6; Doc. 150 at 2, 8); *cf. Jackson v. Elrod*, 881 F.2d 441, 446 (7th Cir. 1989) ("The legitimate state interests here could have been satisfied . . . by simply removing the covers of the hard-bound books."). Although Plaintiff declared that removing the covers from four of his hardbound books "ruined" them, (Doc. 119 at 31), he did not declare—and it would have been highly implausible for him to do so—that removing the covers made them illegible. The Court can certainly understand why this option was not appealing to Plaintiff; however, to satisfy *Turner*, alternative means to exercise a constitutional right need not be "ideal," *Jones*, 503 F.3d at 1153, or "the best method from the inmate's point of view," *Wardell*, 470 F.3d at 961–62 (quotation marks omitted); rather, they simply need to be available. Here, there is no dispute that Defendants offered Plaintiff alternative means to access the information he claims was only available in hardbound books. (*See* Doc. 150 at 6; Doc. 159 at 6.)

Plaintiff argues that these alternative means were nevertheless unavailable to him because OCPF Policy 3-305 defines "nuisance contraband" to include "[a]ny authorized property that has been altered or damaged," and NMCD Policy CD150201(E)(6)(b) provides that "[i]nmates found in possession of property that has been altered . . . will receive a disciplinary report and said property will be confiscated." (Doc. 142-4 at 8*;* Doc. 142-7 at 1; *see* Doc. 149 at 4, 13, 17, 41 *and*

Doc. 150 at 2, 5-6.) According to Plaintiff, he could not have removed the covers from his hardbound books without violating these policies. (*Id.*) However, both the OCPF Inmate Handbooks and the grievance responses Plaintiff attached to his amended complaint show that the OCPF did not consider hardbound books with the covers removed to be nuisance contraband or altered property. In short, Plaintiff's argument fails to create a genuine issue of material fact regarding whether he could have removed the covers from hardbound books he wished to keep or receive during his incarceration at the OCPF. Thus, Defendants' restrictions on Plaintiff's access to hardbound books also satisfy the second *Turner* factor.

Addressing the third *Turner* factor, *i.e.*, the impact on the OCPF of accommodating Plaintiff's First Amendment rights as he requested, *Turner*, 482 U.S. at 90, Defendants presented evidence that,

> [i]f inmates were permitted to receive hardback books in the mail, there would be an increased administrative burden involved in checking each hardback book for contraband, such as needles and illicit substances. This increased administrative burden could result in the need to hire additional staff or purchase screening equipment such as metal/drug detectors to accomplish these additional security checks.

(Doc. 142-1 at 4.) Defendants further note that the increased administrative burden could have delayed other inmates' receipt of mail, which per NMCD policy must be delivered in a timely manner. (Doc. 151 at 6.)

Attempting to refute Defendants' evidence of a significant ripple effect if the OCPF had accommodated his First Amendment rights as requested, Plaintiff first argues that permitting inmates to receive hardbound books directly from publishers, vendors, and book clubs would not have increased the administrative burden on the OCPF to inspect incoming mail for contraband and disruptive content, because Defendants already had a policy of inspecting "all vendor acquired

books and publications."[15] (Doc. 149 at 18.) However, in so arguing, Plaintiff fails to acknowledge or dispute Defendants' evidence that hardbound books are more difficult to inspect than other types of publications, due to the ease with which items may be concealed in their bindings and, often, their greater length. (Doc. 142-1 at 3-4.)

Plaintiff also maintains that Defendants could have searched hardbound books received in the mail quickly and easily using drug dogs and metal detector wands, and that "the validity of a book can be checked in a matter of minutes by checking the ISBN on a web site that sells books or with the Library of Congress."[16] (Doc. 149 at 10-12, 17-18, 22, 37; Doc. 150 at 3-4, 6-7, 19, 24; Doc. 159 at 5.) However, though courts must draw all reasonable factual inferences in favor of prisoners opposing summary judgment, they must also

> distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, [the Court's] inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard*, 548 U.S. at 529–30 (citation omitted).

In addition, Plaintiff's assertions run afoul of the rule that testimonial evidence must be based on personal knowledge. Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602. Because the Court must defer to Defendants' professional judgment regarding the ease and speed with which they could have adequately searched and checked the validity of incoming hardbound books using drug

[15] Plaintiff also hypothesizes that permitting inmates to receive hardbound books directly from publishers, vendors, and book clubs would not have increased the OCPF's administrative burden because inmates would have brought in and ordered only a "small" number of hardbound books. (Doc. 159 at 5.) However, he offers no evidence to support this hypothesis, which is speculative and regarding which he has shown no personal knowledge. *See Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) ("Information presented in [an] affidavit [on summary judgment] must be based on personal knowledge.") (quotation marks omitted).

[16] The Court notes that such a "check" would not allow prison officials to verify the identity of the person or entity who purportedly sent the book.

dogs, metal detectors, and the internet, and because Plaintiff has demonstrated no personal knowledge on these points, his declarations fail to create a genuine issue of material fact.[17] In short, the third *Turner* factor also supports the constitutional validity of Defendants' restrictions on Plaintiff's access to hardbound books.

Finally, with respect to the fourth *Turner* factor, *i.e.*, whether there was a ready alternative that would have fully accommodated Plaintiff's rights at *de minimis* cost to the OCPF, *Turner*, 482 U.S. at 90-91, Plaintiff again suggests either using drug dogs and metal detectors to inspect hardbound books, or allowing inmates to receive hardbound books directly from publishers, vendors, and book clubs. (Doc. 150 at 3-4, 6, 24.) However, for the reasons already discussed, Defendants have shown that these alternatives would have imposed significant costs on the OCPF, and Plaintiff has failed to demonstrate a genuine factual dispute on this point. Therefore, the fourth *Turner* factor also weighs in Defendants' favor with respect to their restrictions on Plaintiff's access to hardbound books.

In sum, viewing the record evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, each *Turner* factor supports the constitutional validity of the challenged restrictions on Plaintiff's possession and receipt of hardbound books. Because there is no genuine issue of material fact, Defendants are entitled to summary judgment on Plaintiff's claims that Defendants violated his First Amendment rights by restricting his access to hardbound books during his incarceration at the OCPF. For the same reasons, Plaintiff is not entitled to summary judgment on these claims.

b. Approved Vendor List

[17] Plaintiff's declaration that he has seen prison guards use drug dogs to quickly and easily search the OCPF library, (Doc. 150 at 24), does not show personal knowledge of how long it would take and how difficult it would be to adequately search hardbound books received through the mail, if only for the obvious reason that books arriving from the outside would require a more thorough review and search than books already in the prison library.

Plaintiff next claims that Defendants violated his First Amendment rights by requiring him to purchase publications from approved vendors. (Doc. 119 at 36-38.) From before March 2013 to October 2016, the OCPF used an approved vendor list and only permitted inmates to purchase newspapers, books, and magazines from approved vendors. (Doc. 156 at 13; Doc. 159 at 8-9.) From October 2016 to after April 2017, the OCPF "maintained its approved vendor list" but also allowed inmates to purchase publications from publishers.[18, 19] (*Id.*)

On November 14, 2014, Plaintiff filed an informal complaint asserting that the OCPF's use of an approved vendor list was "not right." (Doc. 1-1 at 174.) On November 18, 2014, G. Valle responded that the warden had approved the list but it was "subject to change." (*Id.* at 175.) On November 19, 2014, Plaintiff filed a formal grievance regarding this issue, (*id.* at 176), and on November 28, 2014, L. Eason responded by citing to an NMCD policy requiring inmate personal property to be purchased through the prison canteen or an approved vendor. (*Id.* at 177.) L. Eason added that a committee to determine approved vendors was "held each year," "inmates are allowed to request new vendors," and the next such committee "should be held around January or February." (*Id.*) L. Eason suggested that if Plaintiff "would like to submit requests to have a

[18] In his April 2, 2020 affidavit, Defendant Martinez used the terms "vendor" and "publisher" interchangeably and did not indicate whether the OCPF's policies with respect to vendors and publishers were different and, if so, for what time periods. (Doc. 142-1 at 7-9.) However, in his August 13, 2020 affidavit, Defendant Martinez clarified his testimony on these points. (Doc. 156 at 13.) The Court notes that, according to the latter affidavit, the OCPF stopped using an approved vendor list in July 2017, and now simply requires inmates to receive publications directly from a vendor or the publisher. (*Id.*)

[19] In his response to Defendants' Supplemental *Martinez* Report, Plaintiff alleges that Defendants did not respond to his "numerous requests" for leave to purchase publications directly from publishers—presumably after the October 2016 policy change, though he does not specify the dates of his requests—and that the policy change was illusory. (Doc. 159 at 8-9, 21.) However, Plaintiff did not make these factual allegations under penalty of perjury and thus, the Court cannot consider them as evidence in ruling on the parties' summary judgment motions. 28 U.S.C. § 1746; *Hall*, 935 F.2d at 1111. Moreover, even if the Court were to accept these allegations as true, they would not change the Court's recommended disposition, because Defendants' approved vendor restrictions both before and after October 2016 satisfy the *Turner* standard, as further discussed herein.

vendor authorized," he should do so at that time. (*Id.*) On December 2, 2014, Plaintiff filed a grievance appeal regarding this issue. (*Id.* at 178.)

In May 2016, Plaintiff ordered three paperback books from Prison Legal News ("PLN"), which Defendants rejected because PLN was not an approved vendor.[20] (Doc. 1-1 at 45; Doc. 76 at 2, 18-20; Doc. 119 at 150-52; *see* Doc. 150 at 2-3, 8, 21.) There is no record evidence that Plaintiff filed an informal complaint, formal grievance, or grievance appeal regarding these books.[21] The OCPF's approved vendor restrictions also prevented Plaintiff from purchasing certain magazines he wished to read. (Doc. 150 at 21.)

The parties dispute whether Plaintiff could have effectively requested that a new vendor be added to the approved vendor list or sought the warden's exceptional approval of particular purchases from non-approved vendors. Defendant Martinez attested that

> [a]ny inmate can request that a certain publisher be added to the approved publisher's list. Moreover, specific books, publications, and/or orders are considered and approved even if the publisher does not appear on the approved publishers list.

(Doc. 142-1 at 8.) However, Plaintiff declared that Defendants did not respond to his requests to add approved vendors or for exceptional approval of specific purchases. (Doc. 149 at 22; Doc. 150 at 8.) Plaintiff also declared that, in his last year at the OCPF, a memorandum informed

---

[20] Although Plaintiff declared that Defendants rejected the books he ordered from PLN "*only* because PLN was not an approved vendor," (Doc. 150 at 3 (emphasis added)), he later declared that Defendants rejected these books because they contained "legal information specifically aimed to help prisoners." (*Id.* at 8.) Plaintiff has presented no evidence demonstrating personal knowledge that Defendants rejected the books he ordered from PLN because of their contents, nor has he presented any evidence that the OCPF had a policy or practice of rejecting legal information designed to help prisoners. As such, his conclusory declaration fails to create a genuine factual dispute on this point. *See Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) (courts "do not consider conclusory and self-serving affidavits" on summary judgment).

[21] Again, in their Motion, Defendants do not contend that Plaintiff failed to exhaust his administrative remedies with respect to his First Amendment claims based on Defendants' rejection of the three books he ordered from PLN. (*See generally* Doc. 143.)

inmates that the approved vendor process would be competitive, *i.e.*, the addition of a new vendor would require the removal of an old one. (Doc. 149 at 21.)

The parties also dispute—and incidentally display some confusion regarding—who was on the approved vendor list from March 2013 to April 2017. Defendant Martinez attested that, from 2013 to 2016, the following book vendors were approved: (a) Troll and Toad; (b) Christian Book; (c) Barnes & Noble; (d) Al Anwar; and, (e) Islamic Bookstore.[22] (Doc. 142-1 at 7.) According to Defendant Martinez, Christian Book had a 500,000-book catalog and Barnes & Noble offered over a million titles. (*Id.*) The OCPF Inmate Handbooks from January 2013 through September 2016 also listed Troll and Toad, Christian Book, Barnes & Noble, Al Anwar, and Islamic Bookstore as approved vendors. (Doc. 142-10 at 11, 31, 51, 69.) However, the October 2016 handbook listed the OCPF's approved book vendors as Hamilton Booksellers, Wisdom Publications, Wyrd's Way Publications, Islamic Bookstore, Asatru, Christian Book, and Triarco. (*Id.* at 84.)

Plaintiff, in turn, declared that, during most of his incarceration at the OCPF, there were only two approved book vendors, *i.e.*, Hamilton Booksellers and Christian Book, and that Barnes & Noble was added "shortly" before his departure.[23] (Doc. 149 at 39.) However, Plaintiff also

---

[22] Plaintiff declared that, under Rule 56(d), he should be allowed to discover the catalogs of other approved vendors listed in Defendant Martinez's affidavit to show that these other vendors do not sell publications. (Doc. 149 at 19; Doc. 150 at 32.) However, Defendant Martinez's affidavit is unambiguous on this point; *e.g.*, he expressly indicated that "Noc Bay" sells "Native American arts & crafts" and "Union Supply" sells "care packages for inmates." (Doc. 142-1 at 7.) There is thus no need for Plaintiff to obtain these vendors' catalogs, and the Court denies Plaintiff's request.

[23] It is unclear whether Plaintiff made this declaration based on personal knowledge, or rather based on *Heard v. Marcantel*, in which the parties did not dispute for summary judgment purposes that Hamilton Booksellers and Christian Book were the only approved book vendors at the OCPF at some point between July 2013 and March 2017. *See Heard v. Marcantel*, Civ. No. 15-516 MCA/SMV, 2017 WL 3412094, at *1, *4 (D.N.M. Mar. 16, 2017). In so finding, the *Heard* court relied on a June 2016 memorandum the plaintiff submitted, in which A. Waters stated that the OCPF was then using only Hamilton Booksellers and Christian Book "for ordering books for inmate population" but was "in the process of adding more vendors." *Heard v. Marcantel*, Civ. No. 15-516 MCA/SMV, Doc. 63 at 17 (D.N.M. filed Jul. 13, 2016). In *Heard*, the defendants elected not to present any evidence to clarify or contradict this memorandum, likely because the plaintiff in that case was not challenging the OCPF's use of an approved vendor list. *Id.*, Doc. 67 at 4-5 (D.N.M. filed Jul. 27, 2016). Here, however, Defendants have made a different choice, and have thereby created a very different record with respect to the approved vendors and publishers from whom inmates could order publications between March 2013 and April 2017. The Court therefore declines to rely on the *Heard* decision

declared that the two hardbound books he received in the mail in December 2015 were either from Amazon or Barnes & Noble and that they came from an approved vendor. (Doc. 1-1 at 179; Doc. 119 at 31; Doc. 150 at 2, 8, 18.) Thus, Plaintiff has necessarily admitted that one of these mass market booksellers was an approved vendor by December 2015. Plaintiff also attached to his amended complaint an undated memorandum listing Barnes & Noble, Christian Book, Scroll Publishing, Hamilton Booksellers, Hastings, Al Anwar, and Islamic Bookstore as approved book vendors. (Doc. 119 at 149.) In addition, he declared that the OCPF maintained a list of forty approved magazines.[24] (Doc. 150 at 2, 17.)

On the foregoing record, there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on Plaintiff's First Amendment claims challenging Defendants' approved vendor restrictions. Addressing the first *Turner* factor, Defendants proffered that these restrictions

> help[ed] OCPF to focus its resources needed to review books that are mailed to inmates. Anyone who prints a book could potentially be a "publisher." As such, these policies help[ed] to protect against the situation whereby any number of "publishers" can send any number of books to inmates at OCPF, overtaxing OCPF's resources and jeopardizing the effectiveness of OCPF's security reviews.

(Doc. 142-1 at 7-8.) He further clarified that,

> [a]lthough books from approved publishers [were] also reviewed for contraband and content, having approved publishers help[ed] to alleviate the security concern that the alleged "publisher" is a phony being used as a front to send contraband and/or illicit content.

(*Id.* at 7.)

---

in determining whether there are genuine issues of material fact regarding Plaintiff's constitutional challenge to Defendants' approved vendor restrictions. *See generally Wardell*, 470 F.3d at 961 (*Turner* analysis must be done on "case-by-case basis"). However, as is required on summary judgment, the Court will resolve its doubts regarding whether Plaintiff's declaration is based on personal knowledge in Plaintiff's favor in deciding Defendants' Motion.

[24] Plaintiff attached to his amended complaint a purported copy of a November 2016 memorandum listing the OCPF's approved magazines. (Doc. 119 at 148.) However, this document is inauthentic on its face and the Court will not rely on it.

Again, "protecting prison security [is] a purpose . . . central to all other corrections goals." *Thornburgh*, 490 U.S. at 415 (quotation marks omitted). Thus, there is no question that the proffered purpose of Defendants' approved vendor restrictions—*i.e.*, to limit the introduction of contraband and disruptive content into the OCPF—is legitimate and neutral.

Plaintiff again argues that the challenged restrictions are not rationally related to Defendants' proffered objective because inmates were more likely to use other methods to smuggle contraband or disruptive content into the OCPF. (*See, e.g.*, Doc. 149 at 19; Doc. 150 at 7.) Again, however, even assuming that Plaintiff's assertions are true and based on personal knowledge, there is no First Amendment rule that a prison policy is only proper if it addresses the most acute security risks. Rather, again, the test is simply whether "defendants might reasonably have thought that the policy would advance [the prison's] interests." *Sperry*, 413 F. App'x at 40. Here, Defendants reasonably believed that their approved vendor restrictions would limit the introduction of contraband and disruptive content into the OCPF via books, magazines, and newspapers. Therefore, the challenged restrictions are rationally related to the legitimate, neutral penological objective of smuggling prevention and satisfy the first *Turner* factor. *See also Payne v. Friel*, No. 2:04-CV-844-DAK, 2007 WL 1100420, at *8 (D. Utah Apr. 10, 2007), *aff'd in relevant part*, 266 F. App'x 724 (10th Cir. 2008) ("[T]here is an obvious connection between the prison's approved vendor policy and the governmental interest in preventing contraband from entering the prison.").

Regarding the second *Turner* factor, *i.e.*, whether Plaintiff had alternative means of exercising the right at issue, *Turner*, 482 U.S. at 90, and construing genuinely disputed facts in Plaintiff's favor, Plaintiff had access to newspapers, "numerous recreational magazine subscriptions," and 3,000 books through the OCPF library, as well as roughly one-tenth of the books he requested through the interlibrary loan process. (Doc. 142-1 at 4-6; Doc. 149 at 2, 16,

47, 49-50, 53-54; Doc. 150 at 5.) He could also purchase books, magazines, and newspapers from Hamilton Booksellers and Christian Book from March 2013 to November 2015, and from Hamilton Booksellers, Christian Book, and Barnes & Noble or Amazon from December 2015 to April 2017. (Doc. 1-1 at 179; Doc. 149 at 39; Doc. 150 at 2, 8, 18.) Christian Book had a 500,000-book catalog and Barnes & Noble offered over a million titles. (Doc. 142-1 at 7.)

Plaintiff disputes that all of Christian Book's and Barnes & Noble's titles were available to him, because some were hardbound, some contained prohibited content, and some did not interest him. (Doc. 149 at 19-20; Doc. 150 at 7, 17.) However, as discussed above, there is no dispute that Plaintiff could have kept the hardbound books he ordered had he been willing to remove the covers. And, even assuming that some books sold by Christian Book and Barnes & Noble included prohibited content, there is no evidence tending to show that the subtraction of these books would reduce the 1.5 million titles otherwise available from these vendors to any material degree. And, of course, the fact that some or indeed many of the publications sold by Christian Book and Barnes & Noble did not interest Plaintiff is both irrelevant and inevitable given the vast number of titles they offered.

Plaintiff also argues that he did not have alternative means of exercising the right at issue because he could not access specific publications he wanted to read, *e.g.*, publications from PLN, legal reference books, and religious and veterinary publications. (*See, e.g.*, Doc. 150 at 21.) In so arguing, however, Plaintiff forgets that "the right" in question must be construed sensibly and expansively. *Thornburgh*, 490 U.S. at 417. In other words, "the right" at issue here is not Plaintiff's right to read a specific book. Rather, it is to have access to "a broad range of publications," which Plaintiff indisputably did. *Id.* at 418. For these reasons, Defendants' approved vendor restrictions from March 2013 to April 2017 also satisfy the second *Turner* factor.

Addressing the third *Turner* factor, *i.e.*, "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," *Turner*, 482 U.S. at 90, Defendants presented evidence that

> [t]o require OCPF staff to process and thoroughly inspect mail from non-approved vendors would burden the administration, make it difficult if not impossible to comply with . . . time constraints [for delivering mail to inmates], and potentially disadvantage other inmates whose mail would be delayed.

(Doc. 142-1 at 8.)

Attempting to refute this evidence, Plaintiff argues that inspecting publications from non-approved sources would not have added to the OCPF's administrative burden or impeded its timely delivery of mail to other inmates, because the OCPF already inspected all incoming mail for contraband and disruptive content. (Doc. 149 at 23.) In so arguing, however, Plaintiff overlooks Defendants' undisputed evidence that the approved vendor policies allowed the OCPF to "focus" its resources, in the patently logical sense that publications from unknown sources would have required more thorough and time-consuming inspections than publications from known, vetted, and trusted sources because they would have been more likely to contain contraband or disruptive content. (Doc. 142-1 at 7-8.) Thus, the third *Turner* factor also supports the constitutional validity of the approved vendor restrictions in effect at the OCPF during Plaintiff's incarceration there.

Finally, with respect to the fourth *Turner* factor, *i.e.*, whether there was an easy, obvious way for the OCPF to fully accommodate Plaintiff's rights at *de minimis* cost, *Turner*, 482 U.S. at 90–91, Defendants presented evidence that "[t]here is not an obvious or easy alternative that would allow inmates to obtain books from unapproved vendors without significantly and adversely affecting the interests previously identified." (Doc. 142-1 at 8.)

Attempting to refute this evidence, Plaintiff purports to identify three such alternatives, *i.e.*: (1) using drug dogs and metal detectors to search publications from non-approved sources; (2)

having property officers check the validity of the publisher of each such publication on the internet; and, (3) allowing pre-approval of purchases from non-approved vendors on a case-by-case basis. (*See, e.g.*, Doc. 149 at 22-23; Doc. 150 at 9.) However, none of these alternatives involve *de minimis* costs to the OCPF. As previously discussed, Defendants have established that allowing inmates to receive publications from non-approved sources would have increased the administrative burden of inspecting inmate mail and delayed its delivery. And, though Plaintiff argues that it would take mere "minutes" for prison officials to check a publisher's validity or pre-approve a purchase from a non-approved vendor, (*see, e.g.*, Doc. 149 at 18-19, 22, 37), even minutes would have consumed considerable prison resources when multiplied by all of the publications inmates could have ordered from non-approved sources. Therefore, the fourth *Turner* factor also weighs in Defendants' favor with respect to their approved vendor restrictions.

More generally, Plaintiff argues that the Court should reject Defendants' use of an approved vendor list because other courts have done so. (Doc. 149 at 20, 32; Doc. 150 at 9, 20; Doc. 159 at 12.) However, none of the cases Plaintiff cites expressly address prison officials' use of approved vendor lists. For example, *Krug v. Lutz*, 329 F.3d 692 (9th Cir. 2003), does not include the passage Plaintiff purports to quote from it, and concerns a due process claim. *Murphy v. Missouri Department of Corrections*, 372 F.3d 979, 986 (8th Cir. 2004), *Williams v. Brimeyer*, 116 F.3d 351, 354 (8th Cir. 1997), and *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1031 (2d Cir. 1985), *overruled by O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 n.2 (1987), in turn, address content-based restrictions not at issue here.

The Second Circuit's decision in *Shakur v. Selsky*, 391 F.3d 106 (2d Cir. 2004), comes closest to supporting Plaintiff's argument. In *Shakur*, the court held that the plaintiff stated a legally sufficient First Amendment claim based on the defendants' confiscation of political

literature from an "unauthorized organization." *Id.* at 115. However, even that case is plainly distinguishable because, in *Shakur*, the appellate court was reviewing the district court's *sua sponte* dismissal of the plaintiff's claim on the pleadings, rather than a grant of summary judgment. *Id.* And, as the Second Circuit noted, "[a]t the point of summary judgment"—as here—the plaintiff will have "assemble[d] evidence to attempt to meet his burden of proof," the defendants will have "articulate[d] rationales for [their] policy," and the court "could thus find the government's explanation valid and rational, and hold that the plaintiff could not meet his burden of proof." *Id.* (citation, ellipses, and quotation marks omitted).

For all of the foregoing reasons, there is no genuine issue of material fact and Defendants are entitled to summary judgment on Plaintiff's First Amendment claims challenging Defendants' approved vendor restrictions during his incarceration at the OCPF. For the same reasons, Plaintiff is not entitled to summary judgment on these claims.

c. Newspaper Articles and Internet Printouts

Finally, Plaintiff claims that Defendants violated his First Amendment rights by restricting his access to newspaper articles and internet printouts during his incarceration at the OCPF. (Doc. 119 at 14-19.) Defendants rejected Plaintiff's mail as a result of these restrictions on two occasions.[25] First, on July 2, 2014, Defendants rejected mail from Plaintiff's mother because it contained printouts of internet articles. (Doc. 1-1 at 150-59.) The Mail Rejection Form, which Defendant Moreno signed, gave as the reason for the rejection that "Internet articles [are] not allowed." (*Id.* at 150.) Plaintiff submitted an informal complaint regarding this rejection, in

[25] In their *Martinez* Report, Defendants cite to a portion of Plaintiff's amended complaint listing eight types of mail that Plaintiff claims were rejected because they included internet printouts. (Doc. 142 at 9-10.) However, the cited portion of the amended complaint concerns mail that the GCCF rejected and is therefore irrelevant to the Court's analysis here. (*See* Doc. 119 at 19.)

response to which F. Muniz stated, "[t]he articles sent to you by mail must come from the publisher." (*Id.* at 153.) Plaintiff then submitted a formal grievance, in response to which Defendant Moreno stated that publications will be delivered to an inmate "if they are received directly from the publisher or [vendor] upon approval." (*Id.* at 156.) In a subsequent memo, K. Boyd added that, "[a]fter further review . . . [n]either NMCD policy nor MTC policy specifically state that you are or not allowed information downloaded from the internet. The issue would need approval from the Warden concerning the information that you are requesting." (*Id.* at 157.) There is no record evidence indicating whether Plaintiff subsequently requested the warden's approval for the internet articles rejected on July 2, 2014.

Second, on September 8 or 18, 2014,[26] Defendants rejected mail from Plaintiff's mother because it contained photocopies of newspaper articles. (*Id.* at 162-68.) The Mail Rejection Form regarding this mail, which Defendant Moreno signed, gave as the reason for the rejection that "[n]ewspaper articles [are] not allowed." (*Id.* at 162.) Plaintiff submitted an informal complaint regarding this rejection, to which G. Valle responded by stating that "no newspaper articles will be allowed through the mail. You may purchase articles through an approved vendor." (*Id.* at 163-64.) Plaintiff also submitted a formal grievance, to which L. Eason responded by citing to NMCD policies stating that "[b]ooks and magazines will be accepted and delivered to inmates if they are received directly from the publisher or vendor," and "inmates may acquire books, magazines, and newspapers from the publisher." (*Id.* at 165-67.) L. Eason added that Plaintiff's grievance was being dismissed "on the basis of the newspaper not being received from the publisher." (*Id.* at 168.)

---

[26] The pertinent Mail Rejection Form indicates that the mail in question was rejected on September 8, 2014; however, Plaintiff's informal complaint and portions of his formal grievance indicate that the mail was rejected on September 18, 2014. (Doc. 1-1 at 162-63, 165.)

As previously noted, from March 2013 to October 2016, the OCPF only allowed inmates to receive publications, including newspapers, from approved vendors; and, from October 2016 to April 2017, the OCPF only allowed inmates to receive publications, including newspapers, from approved vendors or the publisher. (Doc. 156 at 13.)

Discerning the OCPF's policy regarding internet printouts requires a closer examination of the record evidence. On April 2, 2020, Defendant Martinez attested that the "OCPF allow[ed] inmates to have some internet printouts after the printouts [were] cleared for security concerns. OCPF, however, prohibit[ed] internet *newspaper printouts* due to copyright issues."[27] (Doc. 142-1 at 8 (emphasis added).) Similarly, on August 13, 2020, he attested that the OCPF did not allow "*articles* printed from the internet." (Doc. 156 at 14 (emphasis added).)

The Mail Rejection Form regarding Plaintiff's July 2, 2014 mail indicates that this mail was rejected because "Internet *articles* [are] not allowed." (Doc. 1-1 at 150 (emphasis added).) Likewise, F. Muniz's response to Plaintiff's informal complaint stated, "[t]he *articles* sent to you by mail must come from the publisher." (Doc. 1-1 at 153 (emphasis added).) And, Defendant Moreno's response to Plaintiff's formal grievance indicated that the mail in question contained an "internet *newspaper article*" and stated that "*[p]ublications* . . . will be accepted and delivered to inmates if they are received directly from the publisher or vendor upon approval." (*Id.* at 156 (emphasis added).) Also, OCPF Policy 7-707 was amended on November 13, 2015 to prohibit "[a]ny *publications*, copied or printed from the Internet." (Doc. 142-9 at 19, 22 (emphasis added).)

---

[27] In the same affidavit, however, Defendant Martinez attested that "[c]opies of articles downloaded from the internet are permitted if they do not pose a serious threat to OCPF's security or otherwise violate NMCD policies and procedures." (Doc. 142-1 at 9.) In considering Defendants' Motion, the Court must construe this potential inconsistency in Plaintiff's favor. The Court will therefore base its proposed findings and recommended disposition on the more restrictive internet printout policy, *i.e.*, that the OCPF prohibited all articles printed from the internet.

Read carefully, this evidence consistently indicates that the OCPF prohibited inmates from receiving printouts of internet *publications*, including articles, rather than all internet printouts categorically.[28] The Court is aware of Plaintiff's declaration that Defendants "denied all of Plaintiff's Internet printouts if it was apparent it was printed from the Internet." (Doc. 150 at 10.) However, the Court will disregard this declaration because it is conclusory; the only specific internet materials Plaintiff claims Defendants rejected were those he received in July 2014, which were undisputedly printouts of articles. *See Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) (courts "do not consider conclusory and self-serving affidavits" on summary judgment). Thus, on the present record, the internet policy Plaintiff challenges is a ban on printouts of publications, including newspaper articles, from the internet.

Addressing the first *Turner* factor, *i.e.*, whether the restrictions at issue are rationally related to a legitimate penological purpose, *Turner*, 482 U.S. at 89, Defendants proffer two penological purposes for the OCPF's restrictions on newspaper articles and printouts of internet publications. First, Defendants state that the OCPF imposed these restrictions "to comply with copyright laws." (Doc. 142 at 10; Doc. 142-1 at 8.) And second, they assert that the OCPF "cannot allow newspaper or internet articles mailed from unapproved third parties because of security concerns," *i.e.*, "to prevent the introduction of contraband" and "illicit content" into the OCPF. (Doc. 142 at 10; Doc. 142-1 at 7; Doc. 151 at 7.)

Ensuring compliance with federal copyright law is unquestionably a legitimate, neutral penological purpose. Moreover, prohibiting publications not received directly from an approved vendor (or from an approved vendor or the publisher) is rationally related to that purpose. *See Waterman v. Commandant, U.S. Disciplinary Barracks*, 337 F. Supp. 2d 1237, 1241 (D. Kan.

---

[28] For example, this policy would not prohibit inmates from receiving printouts of personal e-mail messages.

2004) ("[T]he policy disallowing non-original source material is rationally related to legitimate penal objectives," *inter alia*, as "a way of deterring inmates from violating copyright laws."). Like other publications, newspaper articles and internet publications are likely to be protected by copyright.

> Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

17 U.S.C. § 102(a). "[O]riginal works of authorship" include "literary works," *i.e.*,

> works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, *periodicals*, manuscripts, phonorecords, film, tapes, *disks*, or *cards*, in which they are embodied.

17 U.S.C. § 101 (emphases added); *see also generally* 17 U.S.C. § 512 (setting forth "[l]imitations on liability relating to material online" for service providers).

Notwithstanding Plaintiff's protestations to the contrary, (Doc. 149 at 6-7, 24-25), copyrighted works can generally only be reproduced or distributed with the copyright owner's authorization, regardless of attribution. 17 U.S.C. § 106. There are specific statutory limitations on the owner's exclusive rights; however, none of these are broadly applicable to inmates' receipt of photocopies or internet printouts of publications from sources other than an approved vendor or the publisher. *See* 17 U.S.C. §§ 107-112 (listing limitations to copyright owner's exclusive rights in copyrighted works). Thus, requiring inmates to obtain material likely to be copyrighted—such as a newspaper article—from a source that would almost certainly own the material's copyright or have purchased the right to distribute it—such as an approved vendor or a publisher—is rationally related to the prevention of copyright law violations.[29] Likewise, banning the receipt of internet

[29] It gives the Court pause that, from March 2013 to October 2016, the OCPF did not permit inmates to obtain newspaper articles from publishers, even though *bona fide* publishers would either own the copyright to a work or

publication printouts is rationally related to this purpose, because it is unlikely that an inmate would ever receive such printouts from a source possessing the right to distribute them.

Plaintiff argues that the Second Circuit would not have found a prison ban on newspaper clippings unconstitutional, and the Ninth Circuit would not have found a prison ban on internet material unconstitutional, if such bans were rationally related to the prevention of copyright violations. (Doc. 149 at 34-35; Doc. 150 at 27); *see Clement v. Calif. Dep't of Corr.*, 364 F.3d 1148, 1152 (9th Cir. 2004) (affirming district court's decision that prison's "internet-generated mail policy" violated the plaintiff's First Amendment rights); *Allen v. Coughlin*, 64 F.3d 77, 80-81 (2d Cir. 1995) (reversing district court's decision granting the defendants summary judgment on the plaintiff's First Amendment claims challenging the application of a publishers-only rule to newspaper clippings). However, the prison officials in *Clement* and *Allen* did not assert the prevention of copyright violations as a purpose for the challenged restrictions, and the *Clement* and *Allen* courts thus did not consider or address this purpose. *Clement*, 364 F.3d at 1152; *Allen*, 64 F.3d at 80-81. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *United Food & Commercial Workers Union, Local 1564 of N.M. v. Albertson's, Inc.*, 207 F.3d 1193, 1199 (10th Cir. 2000).

Plaintiff also argues that Defendants' restrictions on newspaper articles and printouts of internet publications could not have been intended to prevent copyright violations because Defendants themselves suggested or allowed copyright violations. Most prominently, Plaintiff

---

have purchased the right to distribute it. Nevertheless, in light of Defendant Martinez's reasonable observation that "[a]nyone" could pose as a publisher, and the fact that a counterfeit publisher would not have the right to distribute a copyrighted work, the Court finds OCPF's pre-October 2016 policy is rationally related to the prevention of copyright violations. (Doc. 142-1 at 7.) Moreover, that Defendants decided to tolerate the risk of counterfeit publishers after October 2016 does not render their prior decision to try to mitigate this risk irrational.

declared that Defendants Barba and Moreno told him that if his family removed the web addresses from the internet articles they mailed him, so that it was "not obvious" they were from the internet, they would "probably be allowed."[30] (Doc. 149 at 24.) However, there is no record evidence that Defendants Barba and Moreno, as OCPF mailroom employees, played a role in enacting the OCPF's policies restricting newspaper articles and internet printouts. As such, their alleged willingness to overlook non-obvious violations of these policies has no bearing on the policies' purpose and fails to create a genuine issue of material fact.[31]

Turning to Defendants' second proffered purpose for the challenged restrictions, again, smuggling prevention is also a legitimate, neutral penological purpose. *See Thornburgh*, 490 U.S. at 415 ("[P]rotecting prison security" is "central to all other corrections goals."). In this regard, Defendants presented evidence that the

> OCPF cannot allow newspaper or internet articles mailed from unapproved third parties because of security concerns including lacing the papers with drugs like ketamine and suboxone, hiding contraband in the folded pages, as well as using such newspapers and internet articles to send coded messages. For example, these papers can be soaked in drugs, and once they enter OCPF, they are cut into pieces and sold to inmates. Inmate[s] then dissolve the paper and use the drugs. . . . I also understand that newspapers and internet printouts from non-publishers can be used to send coded messages.

(Doc. 156 at 13.)

---

[30] Plaintiff also declared that Defendant Martinez permitted guards to bring in pirated movies for inmates to watch. (Doc. 149 at 25.) However, Plaintiff has not demonstrated personal knowledge both that the movies were in fact "pirated" and that Defendant Martinez had reason to know it. Thus, the Court declines to consider this declaration in recommending a disposition of the parties' cross-motions for summary judgment. *Ellis*, 779 F.3d at 1201 ("Information presented in [an] affidavit [on summary judgment] must be based on personal knowledge.") (quotation marks omitted).

[31] Plaintiff also argues that distributing photocopies and internet printouts of articles does not violate copyright law because acts such as giving books as gifts and checking them out of the library do not violate copyright law. (Doc. 149 at 24-25.) Without delving too deeply into the intricacies of copyright provisions that have no application in this case, the Court notes that a person who has purchased her own "particular copy" of a copyrighted work may generally dispose of that copy as she pleases. 17 U.S.C. § 109. However, photocopies and printouts, by their very nature, will almost certainly be duplicates of a person's "particular copy," which cannot be distributed without the copyright owner's authorization. 17 U.S.C. § 106.

OCPF's restrictions requiring inmates to obtain newspaper articles from an approved vendor (or from an approved vendor or the publisher), and prohibiting the receipt of internet publication printouts, are also rationally related to limiting contraband and disruptive content. Defendants' evidence establishes that these materials can be used to smuggle contraband and disruptive content into a prison. Attempting to challenge this evidence, Plaintiff asserts that, in his fifteen years of incarceration, he has never seen or heard of inmates using ketamine in prison, and has only seen or heard of suboxone being smuggled into prison through visits and transfers, and never through newspaper articles or internet printouts. (Doc. 159 at 13.) However, these assertions fail to create a genuine factual dispute for the simple reason that, notwithstanding his lengthy incarceration, Plaintiff lacks personal knowledge of every substance other inmates have used or might use while incarcerated and every way in which inmates have smuggled or could smuggle these substances into a prison.

Plaintiff also argues that Defendants' restrictions on newspaper articles and internet printouts are not rationally related to smuggling prevention because "[r]egular written correspondence and typed correspondence can be used in the very same ways Defendants suggest printed Internet articles and newspaper articles may be used." (Doc. 159 at 13-17 (citing *Clement*, 364 F.3d at 1152 and *Allen*, 64 F.3d at 79-82).) However, again, the Court declines to second-guess Defendants' rational professional judgments regarding which security risks to tolerate and which to mitigate, in light of the Supreme Court's clear directive that these judgments are entitled to deference. *Beard*, 548 U.S. at 529–30; *Turner*, 482 U.S. at 84–85. To the extent that the *Clement* and *Allen* decisions relied on this kind of second-guessing, the Court recommends declining to follow them.

In short, Defendants reasonably believed that the challenged restrictions would significantly reduce the likelihood that inmates' receipt of newspaper articles and internet publication printouts would violate copyright laws or that these materials would be used to introduce contraband and disruptive content into the OCPF, by ensuring that these materials came only from secure and legitimate sources. *Sperry*, 413 F. App'x at 40. For these reasons, Defendants' restrictions on Plaintiff's receipt of photocopies of newspaper articles and printouts of internet publications satisfy the first *Turner* factor.

With respect to the second *Turner* factor, *i.e.*, "whether there are alternative means of exercising the right that remain open to prison inmates," *Turner*, 482 U.S. at 90, again, "'the right' in question must be viewed sensibly and expansively." *Thornburgh*, 490 U.S. at 417. Thus, the Supreme Court has found that prison regulations "permit[ting] a broad range of publications to be sent, received, and read" by inmates "clearly satisf[y]" this factor. *Id.* at 418. Here, as previously discussed, it is undisputed that Plaintiff could access thousands of publications—including books, magazines, and newspapers—from the OCPF library, the interlibrary loan program, approved vendors, and, after October 2016, publishers.

Admittedly, as Plaintiff argues, many newspapers do not sell articles individually, and "[s]ubscriptions are not entirely substitutable for clippings because subscribing requires inmates to anticipate which papers might have articles that they like to read and to subscribe to all such papers," and also requires "the expenditure of personal wealth." *Allen*, 64 F.3d at 80. Thus, the Court understands that the alternatives available to Plaintiff were not "ideal," *Jones*, 503 F.3d at 1153, or "the best method from the inmate's point of view." *Wardell*, 470 F.3d at 961–62. Nevertheless, because Plaintiff could access a "broad range" of publications, Defendants'

restrictions on newspaper articles and internet printouts also satisfy the second *Turner* factor. *Thornburgh*, 490 U.S. at 418.

As previously noted, the third *Turner* factor requires the Court to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. In this regard, as the *Waterman* court observed,

> if inmates were allowed to receive photocopies or Internet-generated materials from non-original sources, [prison] staff would undoubtedly have to expend much greater personnel resources to screen the material for . . . copyright violations, thereby increasing the workload on staff.

*Waterman*, 337 F. Supp. 2d at 1241–42. Given the complexity of copyright law, such screening would have imposed a near-impossible administrative burden on the OCPF. In addition, as Defendant Martinez attested, requiring the OCPF to process and thoroughly inspect newspaper articles and printouts of internet publications "from non-approved vendors would burden the administration, make it difficult if not impossible to comply with . . . time constraints, and potentially disadvantage other inmates whose mail would be delayed." (Doc. 142-1 at 8.) Plaintiff has not asserted any argument to contradict these points that the Court has not already addressed and rejected in this section and Section III.B.2.b., *supra*. For all of the reasons discussed, the third *Turner* factor also supports the constitutional validity of Defendants' restrictions on newspaper articles and printouts of internet publications.

Finally, with respect to the fourth *Turner* factor, Plaintiff has pointed to no easy, obvious alternative that would fully accommodate his right to access newspaper articles and internet publications at *de minimis* cost to the OCPF. *Turner*, 482 U.S. at 90–91. Plaintiff suggests that the OCPF could have allowed inmates to access publications via the internet by distributing tablets and installing firewalls on them to prevent inmates from accessing disruptive content. (Doc. 159

at 14.) However, on its face, this suggested alternative involves considerably more than *de minimis* costs to the prison. Thus, the fourth *Turner* factor also weighs in Defendants' favor with respect to the challenged restrictions on newspaper articles and internet printouts.

In sum, viewing the record evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, each *Turner* factor supports the constitutional validity of the challenged restrictions on newspaper articles and internet publication printouts. There being no genuine issue of material fact, Defendants are also entitled to judgment as a matter of law on Plaintiff's claims that Defendants violated his First Amendment rights by restricting his access to these materials. For the same reasons, Plaintiff is not entitled to summary judgment on these claims.

**C. Plaintiff's First Amendment Retaliatory Transfer Claim**

Finally, in their Motion, Defendants seek summary judgment on Plaintiff's First Amendment retaliatory transfer claim against Defendant Martinez. (Doc. 143 at 22-25.) In this claim, Plaintiff alleges that Defendant Martinez requested his transfer from the OCPF to another facility because he exercised his First Amendment rights by filing and serving the present lawsuit. (Doc. 119 at 43-50.) "It is well-settled that prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts." *Gee*, 627 F.3d at 1189 (quotation mark and alterations omitted).

> While a prisoner enjoys no constitutional right to remain in a particular institution and generally is not entitled to due process protections prior to such a transfer, prison officials do not have the discretion to punish an inmate for exercising his first amendment rights by transferring him to a different institution.

*Frazier v. Dubois*, 922 F.2d 560, 561–62 (10th Cir. 1990).

However,

> it is not the role of the federal judiciary to scrutinize and interfere with the daily operations of a state prison, and our retaliation jurisprudence does not change this

> role. Obviously, an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity. Accordingly, a plaintiff must prove that but for the retaliatory motive, the incidents to which he refers . . . would not have taken place. An inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights.

*Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (emphasis in original) (citation and quotation marks omitted); *see Frazier*, 922 F.2d at 562 n.1 ("Mere allegations of constitutional retaliation will not suffice; plaintiffs must rather allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights.").

For example, the Tenth Circuit found that a prisoner sufficiently alleged specific facts showing unconstitutional retaliation where he alleged "that Defendants were aware of his protected activity, that his protected activity complained of Defendants' actions, and that the transfer was in close temporal proximity to the protected activity."[32] *Gee*, 627 F.3d at 1189; *see also Allen v. Avance*, 491 F. App'x 1, 6 (10th Cir. 2012) ("Our cases allow an inference of whether the defendant[s'] response was substantially motivated by protected conduct where evidence showed (1) the defendants were aware of the protected activity; (2) the plaintiff directed his complaint to the defendants' actions; and (3) the alleged retaliatory act was in close temporal proximity to the protected activity.") (quotation marks omitted); *cf. Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014) ("[T]emporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive.").

---

[32] In the employment context, the Tenth Circuit explained the concept of "close temporal proximity" as follows:

> [i]t appears clear that, if the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference; but it is equally patent that if the adverse action occurs three months out and beyond from the protected activity, then the action's timing alone will not be sufficient to establish the causation element.

*Conroy v. Vilsack*, 707 F.3d 1163, 1181–82 (10th Cir. 2013).

A prisoner may also show retaliatory motive via "specific, objective facts from which it could plausibly be inferred" that the reason given for the adverse act "was pretextual." *Banks v. Katzenmeyer*, 645 F. App'x 770, 773 (10th Cir. 2016).

Here, Plaintiff filed his original complaint in state court on November 14, 2016. (Doc. 1-1 at 1.) Defendant Martinez attested that he "became aware of the Plaintiff's original Complaint . . . on December 21, 2016 and . . . was served with this lawsuit on February 3, 2017."[33] (Doc. 142-1 at 10.) He further attested that, while he does not recall the exact date on which he requested Plaintiff's transfer from the OCPF, he estimates that it was "sometime between" February 23, 2017 and March 21, 2017. (Doc. 156 at 14.)

According to Defendant Martinez, "[t]he decision to request Plaintiff's transfer was unrelated to his history of filing grievances in OCPF or the initiation of this lawsuit." (Doc. 142-1 at 10; Doc. 156 at 14.) Rather, Defendant Martinez attested that he requested Plaintiff's transfer because Plaintiff "violated OCPF and NMCD policy." (Doc. 142-1 at 10.) Specifically, Defendant Martinez attested that

> Pastor Koehne was a church volunteer at OCPF. On February 23, 2017, Pastor Koehne admitted to accepting letters from Plaintiff during Pastor Koehne's religious visits to OCPF, and then mailing these letters for inmate Whitehead after leaving OCPF premises. Plaintiff's actions violated both OCPF and NMCD mail policies and procedures that limit the means and methods of how inmates communicate outside of OCPF. . . . Because Plaintiff circumvented NMCD policies through using a religious volunteer to pass mail, which threatened the safety and security of OCPF as well as the public, I requested that NMCD transfer Plaintiff from OCPF.[34]

---

[33] Plaintiff insists that Defendant Martinez committed perjury by attesting that he was served with process on February 3, 2017, and that he was actually served on February 17, 2017. (Doc. 149 at 6, 30; Doc. 159 at 17.) However, Plaintiff appears to have misread the year as the day on the return of service, which in fact reflects that Defendant Martinez was served on February 3, 2017. (Doc. 1-1 at 260-61.) Plaintiff is admonished to exercise greater care to avoid falsely accusing an opposing party of perjury in future pleadings.

[34] The NMCD policy in question provides that "[a]ll inmates' mail or packages, both incoming and outgoing, shall be opened and inspected for contraband and to intercept cash, checks or money orders. Mail is read and accepted or rejected based on legitimate institutional interests of order and security." (Doc. 142-3 at 3.)

(Doc. 142-1 at 9.)

However, Plaintiff disputes Defendant Martinez's proffered reason for requesting Plaintiff's transfer and submitted evidence that Mr. Koehne did *not* admit to accepting letters from Plaintiff during religious visits and mailing the letters after leaving the prison.[35] Specifically, Plaintiff submitted the declarations of Mr. Koehne and his senior pastor, Timothy Brock.[36] In his declaration, Mr. Koehne stated that, when he and Mr. Brock met with Defendant Martinez and other OCPF officials,[37]

> they asked me if I received anything from the inmates and I replied, "Yes they give me letters all the time. I've even requested some and I still have all of them!" WELL, as soon as words came out of my mouth the atmosphere in the room changed and I could tell something was wrong. *Even after clarifying that these were mailed letters*, they made it clear that the meeting was over.

(Doc. 119 at 314 (capitalization in original) (italics added).) Mr. Brock, in turn, declared that Mr. Koehne "said that he had taken letters from an inmate in the past, and that he still probably had

---

[35] Plaintiff also submitted evidence that he in fact never gave Mr. Koehne anything to sneak out of the OCPF. (Doc. 119 at 314; Doc. 149 at 6; Doc 150 at 11.) However, this evidence is immaterial. As further discussed below, at issue is not whether Plaintiff in fact used Mr. Koehne to pass mail out of the OCPF, but rather whether Defendant Martinez believed he did and acted in good faith on that belief. *See Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) ("The relevant inquiry is not whether [the defendants'] proffered reasons were wise, fair or correct, but rather . . . whether they believed those reasons to be true and acted in good faith upon those beliefs.") (quotation marks omitted).

[36] These declarations are undated. (Doc. 119 at 314-15.) Generally, to have the same force and effect as an affidavit, a declaration must be "subscribed . . . as true under penalty of perjury, *and dated*." 28 U.S.C. § 1746 (emphasis added). However, "the absence of a date does not render a declaration invalid if extrinsic evidence demonstrates . . . the period in which the declaration is signed." *Richardson v. Gallagher*, 553 F. App'x 816, 827–28 (10th Cir. 2014). Here, Plaintiff's Motion for Hearing and/or Decision on Plaintiff[']s Request for a Preliminary Injunction (Doc. 44), which included letters from Mr. Koehne and Mr. Brock substantively identical to their declarations, was filed on May 30, 2017, (*see id.* at 6-7); and, Plaintiff's Motion to Allow Plaintiff to Cure Deficiency in Affidavits by Perry Koehne and Timothy Brock (Doc. 86), in which Plaintiff first submitted the declarations in their current form, was filed on September 20, 2017. (*See id.* at 3-4.) These documents demonstrate that Mr. Koehne and Mr. Brock signed their declarations between May 30, 2017 and September 20, 2017, and the Court will therefore excuse the lack of a date on the declarations.

[37] Mr. Koehne and Mr. Brock declared that this meeting occurred on March 22, 2017, whereas Defendant Martinez attested that it occurred on February 23, 2017. (*Compare* Doc. 19-1 at 3 *and* Doc. 142-1 at 9 *with* Doc. 119 at 314-15.) There is no indication in the record that Mr. Koehne and Mr. Brock met with Defendant Martinez more than once to discuss whether Plaintiff used Mr. Koehne to pass mail out of the OCPF; thus, they appear to be referring to the same meeting.

them. *Later [Mr. Koehne] clarified that he did not take them from the prison, but those letters were mailed to him*." (*Id.* at 315 (emphasis added).)

Based on the record currently before the Court, Defendants have not met their summary judgment burden with respect to Plaintiff's First Amendment retaliatory transfer claim. Initially, on the present record, there is evidence "that Defendant[ Martinez was] aware of [Plaintiff's] protected activity, that [Plaintiff's] protected activity complained of Defendant[ Martinez's] actions, and that the transfer [request] was in close temporal proximity to the protected activity." *Gee*, 627 F.3d at 1189. Specifically, there is close temporal proximity between February 3, 2017, the date on which Defendant Martinez was served with Plaintiff's original complaint, and February 23, 2017, the earliest date on which Defendant Martinez may have requested Plaintiff's transfer.[38]

In addition, there is evidence that, on the current record, could support an inference of pretext. Specifically, on the current record, Mr. Koehne's and Mr. Brock's declarations permit the inference that Mr. Koehne denied allowing Plaintiff to use him to pass mail and thus that Defendant Martinez did not request Plaintiff's transfer in good faith on the belief that Plaintiff used Mr. Koehne in this fashion.[39] *See Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) ("The relevant inquiry is . . . whether [the defendants] believed [their proffered] reasons to be true and acted in good faith upon those beliefs.") (quotation marks omitted). As such, the Court cannot say that there are no genuine issues of material fact with respect to Plaintiff's First Amendment retaliatory transfer claim at this time.[40]

---

[38] Although Defendant Martinez attested that he "became aware of" Plaintiff's state court complaint on December 21, 2016, there is presently no record evidence that he knew anything about its contents—such as the fact that it included claims against him and the allegations supporting those claims—before February 3, 2017. (*See* Doc. 142-1 at 10.)

[39] The Court notes that, to date, none of Defendant Martinez's affidavits have addressed whether Mr. Koehne denied allowing Plaintiff to use him to pass mail and, if so, whether Defendant Martinez discredited that denial in good faith.

[40] Plaintiff also declared that other OCPF inmates who engaged in misconduct were treated differently, and that GCCF Warden Vincent Horton told Plaintiff that Defendant Martinez told Warden Horton to deny Plaintiff access to

Defendant Martinez argues that he is nevertheless entitled to summary judgment on Plaintiff's First Amendment retaliatory transfer claim because "Plaintiff was convicted of the disciplinary charges" at issue. (Doc. 143 at 24.) In so arguing, however, Defendant Martinez oversimplifies the rule on which he relies and ignores the dearth of evidence supporting this defense. It is true that

> an inmate cannot state a claim of retaliation for a disciplinary charge involving a prison rule infraction when a hearing officer finds that the inmate committed the actual behavior underlying that charge and affords the inmate adequate due process.

*Chapman v. Lampert*, 711 F. App'x 455, 458 (10th Cir. 2017) (quotation marks omitted); *see also, e.g.*, *O'Bryant v. Finch*, 637 F.3d 1207, 1215 (11th Cir. 2011) ("If a prisoner is found guilty of an actual disciplinary infraction after being afforded due process *and* there was evidence to support the disciplinary panel's fact finding, the prisoner cannot later state a retaliation claim against the prison employee who reported the infraction in a disciplinary report.") (emphasis in original); *Allmon v. Wiley*, No. 08-CV-01183-MSK-CBS, 2011 WL 4501941, at *8 (D. Colo. Aug. 25, 2011), *report and recommendation adopted*, No. 08-CV-01183-MSK-CBS, 2011 WL 4501937 (D. Colo. Sept. 27, 2011), *aff'd*, 483 F. App'x 430 (10th Cir. 2012) (same).

Here, however, there is very little record evidence regarding what process Plaintiff received before he was transferred, and none to show that a hearing officer afforded him adequate due

---

information regarding his lawsuit. (*See, e.g.*, Doc. 119 at 53; Doc. 149 at 28-29; Doc. 159 at 20, 26-33.) However, the Court will disregard this evidence because the former is irrelevant absent some indication that the other inmates were similarly situated to Plaintiff, and the latter is inadmissible hearsay. *See Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007) (plaintiff may show retaliatory motive via evidence that he was treated differently from other "similarly-situated" persons who violated "rules of comparable seriousness")*;* Fed. R. Evid. 801(c), (d) (non-party's out-of-court statement offered to prove the truth of the matter asserted is hearsay); Fed. R. Evid. 802 (hearsay is generally inadmissible). Moreover, the Court denies Plaintiff's request for "[a] list of men who received disciplinary reports and had disciplinary action taken against them from 2013-2017" to determine whether his transfer was "in line with actions taken against other inmates." (Doc. 150 at 32.) Plaintiff has pointed to no other OCPF inmate accused of an infraction similar to the one with which he was charged who received a lighter punishment, and the requested information is thus neither relevant nor proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1).

process and found that he committed the actual behavior underlying the charge against him. The record reflects that, in general, the OCPF's inmate transfer process is as follows:

> [i]nmates are served a 48-hour hearing notice, advising the inmate they are being scheduled for committee. . . . They have a right to appear or waive the committee. . . . Inmates then will go to committee on scheduled dated [sic]. During the committee the inmates are advised they are being recommended for transfer. The inmates will then sign the transfer committee chronology and are advised they have 15 days to appeal the committee. . . . Committee action is then entered into Criminal Management Information System for NMCD to review and approve or deny.

(Doc. 142-1 at 10.) The record does not indicate what process, if any, inmates are afforded if they elect to appear at a transfer committee, including whether they are notified of the reasons for the proposed transfer or given an opportunity to respond to any allegations of misconduct underlying the transfer request.

With respect to Plaintiff's transfer in particular, it is undisputed that: (a) Plaintiff received a 48-hour hearing notice and "appear[ed]" before a transfer committee[41]; (b) "the committee determined that Plaintiff should be transferred to an alternate Level 3 facility because [he] 'meets criteria for transfer'"; and, (c) Plaintiff submitted a written appeal of this determination.[42] (Doc. 119 at 296-99; Doc. 156 at 14, 20-21.) However, there is no evidence regarding what happened at the transfer committee hearing, no evidence of why the committee determined that he "m[et] criteria for transfer," and no evidence that he received notice of the charge against him and an opportunity to challenge it before the hearing occurred and his deadline to appeal expired. On the contrary, with respect to the allegation that he used Mr. Koehne to pass mail, Plaintiff declared,

---

[41] In his response to Defendants' Supplemental *Martinez* Report, Plaintiff alleged that the "committee hearing" consisted of him meeting with a single caseworker who, when asked about the reason for the transfer, told him only that the warden had requested it. (Doc. 159 at 18.) However, again, Plaintiff did not make these allegations under penalty of perjury and, as such, the Court cannot consider them as evidence in ruling on the parties' summary judgment motions. 28 U.S.C. § 1746; *Hall*, 935 F.2d at 1111.

[42] Plaintiff's transfer appeal does not refer to any proffered reason for his transfer. (Doc. 119 at 296-99.)

and at this time Defendants have presented no evidence to dispute, that Plaintiff "never received a disciplinary report nor did he go through any disciplinary hearing where he could see the charges and call or confront witnesses and see the evidence against him." (Doc. 150 at 11.)

On the foregoing record, there is at least a genuine issue of material fact regarding whether a hearing officer afforded Plaintiff adequate due process and found him guilty of an actual disciplinary infraction in connection with the transfer at issue. Thus, Defendant Martinez is not presently entitled to summary judgment on Plaintiff's First Amendment retaliatory transfer claim based on the process Plaintiff received.[43] For all of these reasons, the Court recommends that Defendants' motion for summary judgment on Plaintiff's First Amendment retaliatory transfer claim be denied at this time.

## IV. Conclusion

The Court recommends that Plaintiff's Motion for Partial Summary Judgment against MTC Defendants (Doc. 124) be DENIED because, viewing the evidence in the light most favorable to Defendants and drawing all reasonable inferences in their favor, Plaintiff has failed to show the absence of a genuine issue of material fact and that he is entitled to judgment as a matter of law on his First Amendment claims based on Defendants' policies restricting his access to information while he was incarcerated at the OCPF. The Court further recommends that OCPF Defendants' Motion for Summary Judgment (Doc. 143) be GRANTED as to Plaintiff's First Amendment access-to-information claims against Defendants because, viewing the record

[43] Defendant Martinez also hints that he should be granted summary judgment on Plaintiff's retaliatory transfer claim by observing that, though he was the person who *requested* Plaintiff's transfer, "[o]nly NMCD has the authority to grant or deny . . . transfer requests." (Doc. 143 at 24; Doc. 156 at 14.) However, Defendant Martinez does nothing to develop this argument and cites no authority to support it, and the Court therefore declines to consider it at this time. *See Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him.") (brackets omitted).

evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, there is no genuine issue as to any material fact and Defendants are entitled to judgment as a matter of law on these claims. However, the Court recommends that Defendants' Motion be DENIED as to Plaintiff's First Amendment retaliatory transfer claim against Defendant Martinez because Defendants have failed to meet their summary judgment burden with respect to this claim.

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

Kirtan Khalsa

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE